# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## FORTH WORTH DIVISION

| | | |
|---|---|---|
| Claudio Vallejo, | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| v. | § | |
| | § | |
| Keller Independent School District and its | § | CIVIL ACTION NO. _____ |
| Board of Trustees Charles Randklev, John | § | |
| Birt, Joni Shaw Smith, Micah Young, | § | |
| Chelsea Kelly, Chris Coker, and Heather | § | |
| Washington in their official capacities, | § | |
| | § | |
| **Defendants.** | § | |

## ORIGINAL COMPLAINT SEEKING DECLARATORY AND PERMANENT INJUNCTIVE RELIEF UNDER THE VOTING RIGHTS ACT AND THE UNITED STATES CONSTITUTION

**BREWER STOREFRONT, PLLC**

By: */s/Joshua H. Harris*_____
William A. Brewer III
State Bar No. 02967035
wab@brewerattorneys.com
Joshua H. Harris
State Bar No. 24127306
jkh@brewerattorneys.com

1717 Main Street, Suite 5900
Dallas, Texas 75201
Telephone: (214) 653-4000
Facsimile: (214) 653-1015

**ATTORNEYS FOR PLAINTIFF**

Plaintiff Claudio Vallejo ("**Plaintiff**" or "**Mr. Vallejo**") files this Original Complaint ("**Complaint**") Seeking Declaratory and Permanent Injunctive Relief Under the Voting Rights Act ("**VRA**" or "**Voting Rights Act**") and the United States Constitution against Defendants Keller Independent School District ("**KISD**" or the "**District**"), and Charles Randklev, John Birt, Joni Shaw Smith, Micah Young, Chelsea Kelly, Chris Coker, and Heather Washington in their official capacities as members of the KISD Board of Trustees (each individually, a "**Trustee**" and together, the "**Board**") (collectively, "**Defendants**"), on personal knowledge as to the facts concerning themselves and on information and belief as to all others as follows:

## I. PRELIMINARY STATEMENT

1.      On its face, the KISD electoral system dilutes the votes of minority citizens within the KISD community, particularly Hispanic voters. Like many electoral systems for school boards throughout Texas, the at-large KISD scheme, coupled with staggered terms and off-cycle voting, enables a white majority to prevent the growing minority community from electing candidates of their choosing. Even as communities become more dispersed and diverse, both racially polarized voting and resulting vote dilution persist.

2.      Past, recent and current events reveal this dilution: though Hispanics comprise 15.4% of KISD's Citizen Voting Age Population ("**CVAP**"), and Hispanic children comprise a quarter of KISD students, a Hispanic candidate has not served on the KISD board in the last 25 years.

3.      Rather, the white majority – whose children make up a minority of the KISD student body – utilizes the dilutive at-large voting system to maintain control of the KISD Board. Predictably, minority students are struggling. The Anglos who have run the KISD for decades do not seem to care about the needs of those children, resulting in an education system that fails to

educate the majority of minority students – including the 49% of Hispanic students who did not meet grade level on the State of Texas Assessments of Academic Readiness (STAAR) exams in 2024.

4.      From the outside looking in, KISD portrays itself as a premier public school district lauded for its commitment to academic excellence and student success. Families move to the district attendance area in pursuit of high-quality education, believing KISD to be a model of opportunity and fairness. However, for Mr. Vallejo, a long-time resident and invested parent, this image is far from reality.

5.      In 2020, determined to provide his children with the best possible education, Plaintiff purchased a home in Tehama Bluffs in Fort Worth, believing it was zoned for KISD. Upon discovering otherwise, in 2021 he moved his family two miles away and bought a house in the Heritage subdivision in Fort Worth, specifically because he and his wife wanted their children to attend the highly regarded KISD schools. Since then, Plaintiff has been an active participant in the District, with a son in fourth grade and a daughter in first grade at Bette Perot Elementary School. His investment in the District is not merely financial – it is deeply personal. In recent years, Mr. Vallejo has become frustrated and believes that the Keller ISD board has not represented him as trustees have undertaken actions to ban books and have pursued other actions he feels were not inclusive.

6.      However, KISD's at-large voting system ensures that the governing Board remains unrepresentative of the District's diverse population. Today, all seven KISD Board Trustees are white. Five of the seven reside in Keller High School feeder pattern– the wealthier, predominantly white portion of the district, home to just 30% of KISD's population. The remaining two trustees live in the western part of KISD, where Plaintiff resides – a more socio-economically diverse area

that comprises 70% of the District's residents. This electoral system denies Hispanic voters a fair opportunity to elect representatives of their choosing, illegally diluting their votes in violation of the Voting Rights Act and the United States Constitution.

7.    The consequences of this systemic imbalance have been stark. The Board's recent actions – particularly its rushed contemplation of detachment – represent an unprecedented departure from established procedures, while disregarding community input in a way that makes clear the at-large system has produced a Board indifferent to the interests of residents like Plaintiff. The result is not only a threat to the educational opportunities Plaintiff fought to secure for his children but also a direct attack on the value of his home and his stake in the District's future.

8.    The injustice of KISD's at-large system is even more apparent in light of demographic realities. According to the Texas Education Agency's ("**TEA**") 2023-23 Texas Academic Reports ("**TAPR**"), students of color comprise over 52% of the District's total student body, with Hispanic students alone accounting for 24.8%. Yet, despite a significant presence, Hispanic voters have not been able to elect a candidate of their choosing to the Board. Hispanic candidates face systemic barriers under the at-large voting system, which operates to the advantage of the majority-white electorate and prevents the Board from reflecting the communities it purports to serve. Hispanic children – who make up a quarter of KISD students – are failed by a system that renders their families politically voiceless. As communities progress toward increased integration, voting remains polarized and at-large systems continue to fail.

9.    This is not merely an isolated grievance – it is a clear violation of the law. Courts across the country have repeatedly struck down at-large electoral systems in school districts and municipalities, recognizing their unlawful dilution of minority voting power. KISD is no exception. As a stakeholder directly constrained by this discriminatory system, Plaintiff seeks

redress. This action demands that the Court declare KISD's at-large electoral structure unlawful under Section 2 of the VRA and the Fourteenth and Fifteenth Amendments to the United States Constitution, enjoin its further use, and order the implementation of a legal, representative voting system. Anything less would allow the District's systemic disenfranchisement of Hispanic voters to continue unchecked.

10.    Plaintiff respectfully prays for this Court to issue: (1) a declaratory judgment that the at-large system in KISD violates Section 2 of the Voting Rights Act and the Fourteenth and Fifteenth Amendments of the Unites States Constitution; (2) an injunction against the further use of at-large elections for the Board; (3) an order requiring that future Board elections be conducted under a method of election that complies with the Constitution and the Voting Rights Act, including a cumulative voting system and a shift to on-cycle elections; (4) an award of costs and reasonable attorneys' fees to Plaintiff, including expert witness fees; and (5) such additional relief as is appropriate.

## II.  JURISDICTION AND VENUE

11.    This is an action for injunctive and declaratory relief under the Act and the Constitution. Accordingly, jurisdiction is proper because: (i) 28 U.S.C. § 1331 grants district courts original jurisdiction over matters arising under the laws of the United States; (ii) 28 U.S.C. § 1343(a)(3) grants district courts original jurisdiction over matters "providing for the equal rights of citizens or of all persons within the jurisdiction of the United States"; and (iii) 28 U.S.C. § 1343(a)(4) grants district courts original jurisdiction over matters "under any Act of Congress providing for the protection of civil rights, including the right to vote."

12.    The Northern District of Texas is the proper venue for this action. Pursuant to 28 U.S.C. § 1391(b)(1), venue is proper in a district where any defendant resides, if all defendants

reside in the state where the district is located. Here, Defendants all reside in the Northern District of Texas. Moreover, venue is proper in the Fort Worth Division pursuant to 28 U.S.C. § 124(b)(2).

13.     Plaintiff's action for declaratory and injunctive relief is authorized by 28 U.S.C. §§ 2201 and 2202, as well as by Rules 57 and 65 of the Federal Rules of Civil Procedure.

14.     Plaintiff seeks attorneys' fees, including expert fees, and costs pursuant to 52 U.S.C. § 10310(e) and 42 U.S.C. § 1988(b)-(c).

### III.  <u>PARTIES</u>

**A.**     <u>**Plaintiff**</u>

15.     Plaintiff is a Hispanic individual, the son of Mexican immigrants, a United States citizen, and a registered voter residing at 3833 Vernon Way, Fort Worth, TX 76244.

16.     Plaintiff values education. He attended the University of Texas at Arlington, receiving a bachelor's degree in advertising with a minor in business administration.

17.     Plaintiff is personally invested in the performance of Keller ISD. He currently has a son in fourth grade and a daughter in first grade at Bette Perot Elementary School.

**B.**     <u>**Defendants**</u>

18.     Defendant KISD is an independent school district located in Tarrant County. KISD may be served with process through its interim Superintendent, Cory Wilson, at the Administration Building, 350 Keller Parkway, Keller, TX 76248.

19.     Defendant Micah Young is a Trustee elected to Position 1 of the Board and resides within KISD. He may be served with process at 8413 Brandonwood Drive, North Richland Hills, TX 76182.

20.     Defendant Joni Shaw Smith is a Trustee elected to Position 2 of the Board, is the Secretary of the Board, and resides within KISD. She may be served with process at 4801 Glen Springs Trail, Fort Worth, TX 76137.

21.    Defendant Chelsea Kelly is a Trustee elected to Position 3 of the Board and resides within KISD. She may be served with process at 5148 Tortola Lane, Fort Worth, TX 76244.

22.    Defendant John Birt is a Trustee elected to Position 4 of the Board, is the Vice President of the Board, and resides within KISD. He may be served with process at 1314 McEntire Court, Keller, TX 76248.

23.    Defendant Chris Coker is a Trustee elected to Position 5 of the Board and resides within KISD. He may be served with process at 1323 Briar Ridge Drive, Keller, TX 76248.

24.    Defendant Charles Randklev is a Trustee elected to Position 6 of the Board, is the President of the Board, and resides within KISD. He may be served with process at 1925 Spring Drive, Keller, TX 76262.

25.    Defendant Heather Washington is a Trustee elected to Position 7 of the Board and resides within KISD. She may be served with process at 904 North Pearson Lane, Keller, TX 76262.

## IV.  FACTS

### A.    KISD Is a Majority-Minority District but Has Inadequate Minority Representation on the Board.

26.    KISD, established in 1911, encompasses an approximately 51 square-mile area including the City of Keller, a portion of the cities of Colleyville, Fort Worth, Haltom City, Hurst, North Richland Hills, Southlake, Watauga, and Westlake. Located approximately 17 miles northwest of downtown Fort Worth, the District exists within Tarrant County, educates over 34,000 students, and serves a population of more than 200,000.

27.    Over the past two decades, KISD has transformed from majority white enrollment to a majority-minority school district, where the population of racial or ethnic minorities comprise most of the student population.

28.    According to TEA, students of color make up 52.6% of the KISD student body as of the 2023-24 school year: with an enrollment that is 47.4% white, 24.8% Hispanic, and 11.4% African American.

29.    Additionally, 34.5% of KISD students are economically disadvantaged ("**ED**") and 12.4% are classified as Emergent Bilingual ("**EB**") or English Learners ("**EL**"), meaning they are in the process of learning the English language. The EB and EL students are predominantly Spanish speakers.

30.    Regrettably, the increasingly diverse ethnic and racial makeup of KISD is not reflected in its elected Board of Trustees, all of whom are white. Moreover, five of the current Board members reside in the predominantly white and affluent neighborhood in the eastern half of KISD. Indeed, Keller proper is separated from the more diverse Fort Worth portion of the District to the west by Denton Highway: a boundary the Board has recently tried to manipulate to divide the Keller ISD community.

31.    Recent Board actions evince a discriminatory purpose in maintaining and utilizing the at-large electoral system to keep a stranglehold on power and resources for the white and affluent in KISD.

32.    Prior to December 19, several of members of the KISD board who reside in Keller proper secretly began to explore a plan to divide KISD into two school districts: one for the 30% of the current KISD population who live on the eastern side of Denton Highway, and the other serving the 70% who live on the western side.

33.     On December 19, the members of the KISD Board who had pursued and developed the detachment plan discussed the proposal in Executive Session. Any such discussions must occur in compliance with the Texas Open Meetings Act to ensure there is adequate input from the parents, local officials, and other KISD stakeholders.

34.     The two Trustees who are from the western side of Denton Highway, Joni Shaw Smith and Chelsea Kelly, confirmed in coordinated Facebook posts that discussions took place among the other board members regarding "a plan to detach a portion of Keller ISD and form a new school district." Indeed, both Smith and Kelly have said they were "blindsided" by the proposal.

35.     Numerous community leaders, including Fort Worth Mayor Mattie Parker, have opposed the detachment and have stated unequivocally that no change should be implemented without a vote by the KISD community.

36.     Only after the discussions from the December 19 Executive Session leaked to the public – and after great community outcry – did KISD hold a Special Board Meeting on January 16, 2025, followed by a Regular Board Meeting on January 30, 2025, to discuss the detachment plan publicly. At the January 16 meeting, KISD Superintendent Tracy Johnson told the KISD Board she was prepared to offer her letter of resignation after speaking out against the possible plan to split the district, saying it wasn't "right for the kids."

37.     The January 30, 2025, Board Meeting revealed the discriminatory intent underlying the detachment plan proposed by the KISD Board, the product of the at-large voting system. The proposal to divide KISD along Denton highway was defended using financial arguments, particularly those outlined in the Moak Casey Revenue Impact Analysis. However, a closer examination of both financial and demographic data reveals that the division has little to do with

financial necessity or student performance. Rather, data suggest that the split is a mechanism for furthering socio-economic and racial segregation by concentrating wealth, property value and educational attainment on the eastern side while isolating lower-income and more diverse communities on the western side.[1]

| Which Side is the Attendance Zone? | Home Values (ACS, 2023) | | |
|---|---|---|---|
| | Under $250k | From $250-500k | Over $500k |
| East of Denton Hwy | 10.0% | 36.3% | 53.6% |
| West of Denton Hwy | 17.8% | 69.0% | 13.2% |
| Split: Both Sides of Hwy | 16.5% | 54.7% | 28.8% |

| Which Side is the Attendance Zone? | Bachelors or Higher (ACS, 2023) |
|---|---|
| East of Denton Hwy | 39.3% |
| West of Denton Hwy | 29.5% |
| Split: Both Sides of Hwy | 31.3% |

| Which Side is the Attendance Zone? | Household Income (ACS, 2023) | | |
|---|---|---|---|
| | Under $50k | From $50-150k | Over $150k |
| East of Denton Hwy | 13.9% | 36.6% | 49.6% |
| West of Denton Hwy | 12.9% | 55.1% | 32.0% |
| Split: Both Sides of Hwy | 15.1% | 47.7% | 37.2% |

| Which Side is the Attendance Zone? | Household Occupation Type (ACS, 2023) | |
|---|---|---|
| | Owner-occupied | Renter-occupied |
| East of Denton Hwy | 79.8% | 20.2% |
| West of Denton Hwy | 67.8% | 32.2% |
| Split: Both Sides of Hwy | 72.2% | 27.8% |

---

[1] The statistical analysis accounts for three distinct Keller ISD attendance zones: (i) those entirely east of Denton Highway, (ii) those entirely west of Denton Highway, and (iii) those that span both sides of Denton Highway. Since the proposed district division follows this highway, it was essential to examine scholastic spending, academic performance, and socio-economic factors across these zones. The analysis was conducted by mapping Census tracts to the attendance zones of each school within KISD, ensuring a comprehensive assessment of demographic and economic distributions.

**ORIGINAL COMPLAINT SEEKING DECLARATORY**
**AND PERMANENT INJUNCTIVE RELIEF**                                              9

| Which Side is the Attendance Zone? | Racial Breakdown of Residents (ACS, 2023) | | |
|---|---|---|---|
| | Perc. White | Perc. Hispanic | Perc. Black |
| **East of Denton Hwy** | 73% | 13% | 5% |
| **West of Denton Hwy** | 59% | 20% | 10% |
| **Split: Both Sides of Hwy** | 60% | 17% | 9% |

38.     The Board's claim that the splitting of KISD would improve funding efficiency ignored increased expenditures, which remain unexamined in the Moak Casey report. The report does not account for new administrative costs, potential diseconomies of scale, or the impact of dividing capital assets, all of which would place a burden on the majority-minority population in KISD who have had inadequate representation resulting from the discriminatory at-large electoral system.[2]

---

[2] The chart below underscores the inefficiencies in the Board's funding report by illustrating that while west-side schools are estimated to receive more funding – likely to lead to higher per-student expenditures – this increased spending does not directly correlate with better scholastic performance. The steeper negative slope of the trendline for west-side schools compared to those east of Denton Highway highlights that, despite broadly greater per-student financial resources, academic outcomes remain suboptimal. This suggests that the real issue is not simply about funding disparities but rather how resources are allocated and how curricula are disseminated. The Board's report fails to address the inefficiencies in the use of existing resources, overlooking how ineffective spending patterns and a lack of focus on curriculum quality exacerbate the challenges faced by the majority-minority population. Thus, splitting KISD would further entrench structural inequities by limiting economies of scale and weakening resource distribution, disproportionately impacting already disadvantaged communities.

**ORIGINAL COMPLAINT SEEKING DECLARATORY**
**AND PERMANENT INJUNCTIVE RELIEF**                                                         10



**B.    KISD's Current At-Large Election System Discourages Minority Participation in the Electoral Process and Violates Section 2 of the Voting Rights Act.**

39.    Texas has a long and well-documented history of racial discrimination against minorities in voting, registration, and participation in the democratic process, including the documented use of at-large voting to dilute or eliminate the strength of Hispanic and African American votes within a geographic area. In fact, the Supreme Court of the United States acknowledged the "political, social, and economic legacy of past discrimination for Latinos in Texas . . . may well hinder their ability to participate effectively in the political process."[3]

---

[3] *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 440 (2006) (internal citations omitted).

40.     The Supreme Court further recognized that voting in Texas is racially polarized, and that the white, African American, and Hispanic populations vote as cohesive blocs. The size of the white population and its political cohesiveness mean that white voters usually vote sufficiently as a bloc to enable them to defeat the minority preferred candidate. In fact, the entire state of Texas was covered under pre-clearance under Section 5 of the Voting Rights Act —which required all changes to school board electoral systems to be approved by the federal government to ensure they did not have a discriminatory intent or impact—from 1972 until the Supreme Court's decision to end pre-clearance in 2013 in favor of Section 2 as the means of enforcing the Voting Rights Act.[4]

41.     KISD's at-large election system arose from this history of discrimination and denies Hispanic voters' equal access to the electoral and political process, in violation of Section 2 of the Voting Rights Act and the Fourteenth and Fifteenth Amendments of the United States Constitution.

42.     Under the current at large system, all voters within KISD vote on every trustee position. Trustees serve three-year staggered terms. The at-large system discourages minority or minority-preferred candidates from seeking office because it effectively functions as a white-controlled referendum on all candidates, where a bloc of white voters controls all seven trustee positions.

43.     The dilution of minority voting resulting from KISD's at-large voting structure is exacerbated by the off-cycle timing of the elections. Historically, off-cycle elections further depress minority participation in the political process. Changing local election times to coincide

---

[4] *Shelby County v. Holder*, 570 U.S. 529 (2013).

**ORIGINAL COMPLAINT SEEKING DECLARATORY
AND PERMANENT INJUNCTIVE RELIEF**                                            12

with federal and state elections would generate increases in turnout and a more representative set of voters.[5]

44.    The 2022 United States Census American Community Survey ("**ACS**") data shows that the citizen voting age population ("**CVAP**") of KISD was approximately 15.4% Hispanic or Latino.  Coupled with the fact that Hispanic students make up 24.8% of the student body, one would expect to find at least one Hispanic member on the Board. However, there are none.

45.    The lack of Hispanic presence in leadership is evident from examining the history of the Board.  According to KISD's website[6], no candidate with a Hispanic surname has been elected to the KISD Board since 1999.

46.     Several candidates who are Hispanic or have Spanish surnames have run for the KISD Board and lost. Jon Rodriguez ran for Place 3 in 2019 and lost, Pilar Fraser ran for Place 2 in 2019 and lost, and Joseph Sandoval ran for Place 1 in 2007 and lost.

47.    Given the history of discrimination against Latinos in Texas, combined with racially polarized voting and the use of an at-large voting system, Hispanic candidates are discouraged from participating in the political process.

48.    These facts underscore the political reality in KISD—whites vote sufficiently as a bloc enabling them to defeat Hispanic candidates.  Consequently, the current at-large election system precludes effective representation of KISD's diverse student body and robs Hispanic voters and people of color from having a meaningful opportunity for full and fair participation in the election process.

---

[5] Micheal T. Hartney and Sam D. Hayes, *Off-Cycle and Out of Sync: How Election Timing Influences Political Representation*, State Politics and Policy Quarterly (2021).

[6] Plaintiff reviewed both the KISD website and TEA Directories to examine KISD Board composition from 1999 to the present.

C.    **Plaintiff Is Negatively Impacted by KISD's Illegal Electoral System.**

49.    Plaintiff, a resident of KISD since 2021, has a vested interest in KISD, with two children attending school in the District.

50.    Plaintiff specifically moved to KISD to provide his children with the high-quality education for which the District is known. In fact, in 2020, Plaintiff originally bought a house in Tehama Bluffs, believing that the address was zoned for KISD. Upon learning that the house was not zoned for KISD, Plaintiff uprooted his family and moved to a house two miles away to ensure that his children could attend KISD schools.

51.    Yet, the at-large system has resulted in a KISD Board which does not represent the diversity of the community. All seven KISD Board trustees are white. Five of the seven Board Trustees reside on the east side of the district, the more affluent and predominantly white part of KISD that includes Keller proper (with only 30% of the District's population). The other two of the seven Trustees reside in Fort Worth in the western part of KISD, the more socio-economically disadvantaged and racially diverse part of KISD (with 70% of the District's population). Plaintiff resides in the western part of KISD.

52.    There is a clear correlation between the highest-performing schools in the District and the feeder zones where Trustees reside.[7]

| STAAR: "At Meets Grade Level or Above" | | | |
|---|---|---|---|
| | Board Member Resides in School Zone | | Difference Between "Yes" and "No" |
| | Yes | No | Standard Deviations | Cohen[†] Effect Designation |
| Average of Campus-level | 65% | 51% | 0.98 | Large |

[†] Cohen, Jacob. *Statistical Power Analysis for the Behavioral Sciences*. 2nd ed. Hillsdale, NJ: Lawrence Erlbaum Associates, 1988, 20–27.

[7] The Jacob Cohen difference measure standardizes effect size across samples, enabling meaningful comparisons between studies irrespective of sample size or measurement scale. By focusing on effect size rather than statistical significance alone, it provides a clearer indication of practical relevance, ensuring robust and interpretable results.

53.     The recent Board actions contemplating detachment – a brazen departure from normal procedures that disregarded community input – have made clear that the at-large voting system has manifested an unrepresentative KISD Board that seeks to remove Plaintiff and his family from KISD, diminishing not only the value of Plaintiff's home but also the educational opportunities for his children.

### D.     Neither KISD's Teachers nor the Trustees Reflect the Diverse Multiethnic, Multiracial, and Multilingual Student Body.

54.     The KISD Board is responsible for overseeing and managing a school district with 42 schools, an annual budget exceeding $330 million, and nearly 34,000 students. Based on the District's changing demographics, one would expect to see a subsequent increase in diversity in its teachers, leadership positions, and membership on the Board. However, the makeup of the Board evinces how disconnected the KISD Board is from the diverse multiethnic, multiracial, and multilingual community comprising the District.

55.     While Hispanic students are KISD's largest ethnic or racial minority demographic group, Hispanic teachers are dramatically underrepresented among KISD faculty. About 14.0% of teachers are Hispanic compared to 24.8% of students. Meanwhile, Anglo teachers are overrepresented, as 77.6% of teachers are white compared to about 47.3% of students.  Hispanic representation among KISD teachers lags the state level: approximately 30% of teachers in Texas public schools are Hispanic. Put differently, the trickle-down impact of the lack of diversity on the KISD Board manifests in the demographic makeup of its teachers when compared to the students they serve.

56.     KISD leadership has a similar lack of diversity. The current interim Superintendent is white and all five current assistant superintendents are white. Indeed, 90% of the highest-ranking officials in KISD who make up the Superintendent's cabinet are white.

**E.     The Discriminatory Effects of KISD's At-Large System Upon Minority Voters.**

57.     The KISD Board is responsible for ensuring that resources are allocated in a manner that benefits all children equally regardless of the neighborhood in which a student resides. Unfortunately, the Board's fiscal and policy decisions have resulted in an unacceptable performance gap between white and minority students in the District.

58.     The effects of discrimination are still disproportionately borne by Hispanic and other minority residents in KISD in areas such as education. On the 2024 STAAR exams, while 69% of the white students met grade level, only 51% of the Hispanic students and 40% of the African American students met grade level.

59.     According to the most recent TEA data from the 2022-23 school year, 50.2% of African American seniors and 54.7% of Hispanic seniors in KISD reached the college readiness threshold, while 70.7% of white students did so.

60.     The lack of diverse representation on the Board further fuels overt racism that has been extensively reported in local and statewide Texas media.

61.     In July of 2020, students and parents in the KISD community gathered more than 29,000 signatures in a petition to change the Keller High School mascot from the Indians, saying the mascot is racist toward Native Americans. They presented their petition and advocated for change at a virtual KISD Board meeting, yet the Board disregarded their concerns.[8]

---

[8] Carla Jimenez, *Keller High School Students Are Fighting to Change a Mascot They See as Racist*, Spectrum News 1, August 6, 2020, (last accessed: February 10, 2025), Keller Students Fight to Change High School Mascot

**ORIGINAL COMPLAINT SEEKING DECLARATORY**
**AND PERMANENT INJUNCTIVE RELIEF**                                                          16

62.    In August of 2021, Erica Olivo, a mother of a senior at Timber Creek High School, complained to officials after racist images were discovered in two high school parking spaces. The images, one allegedly depicting white supremacy and the other a cartoon caricature of a Native American, were found at Timber Creek and Keller High School.[9]

63.    In 2024, KISD garnered national attention for banning books from its libraries. This action ignored the opinions of many in the community, including Plaintiff, who feel that removing a diversity of viewpoints from the bookshelves deprives their children of a well-rounded education. One of the challenged books was "Out of Darkness" by Ashley Hope Pérez, a love story between a teen Mexican American girl and teen African American boy in an East Texas town in the 1930s that touches on racism and segregation. The book was removed from the shelves and students could only read it by request with parental permission.[10]

64.    In October of 2024, KISD adopted an alternative meal plan, whereby upon reaching a negative lunch balance greater than $25 students would receive an alternative meal until their balance was resolved. This policy has a disproportionate impact on minority communities.[11]

65.    The legacy of the at-large KISD electoral system is one blocking minorities, including Hispanics, from political participation and perpetuating a white-controlled board that is failing students of color. The recent clandestine Board actions magnify the need for KISD to adopt

---

[9] Elizabeth Campbell, *Keller ISD Mom Reported Racist Images Painted on Parking Spaces at Two High Schools, Fort Worth Star-Telegram*, August 24, 2021, (last accessed February 10, 2025), Keller TX school parking spaces had offensive images | Fort Worth Star-Telegram

[10] Ashley Hope Pérez, *I wrote 'Out of Darkness' for my High School Students. Now High Schools are removing It*, February 11, 2022, (last accessed February 13, 2025), I wrote 'Out of Darkness' for my high school students. Now high schools are removing it

[11] Julia James, *Keller ISD Introduces "Alternative" Meals For Students With $25 or More of Lunch Debt*, The Dallas Morning News, October 12, 2024, (last accessed February 10, 2025), Keller ISD introduces 'alternative' meals for students with $25 or more of lunch debt

**ORIGINAL COMPLAINT SEEKING DECLARATORY**
**AND PERMANENT INJUNCTIVE RELIEF**                                    17

an electoral system that ensures Hispanic voters have a meaningful opportunity for full and fair participation in the electoral process to elect Trustees who are responsive to the needs of the children in their community.

**G.    Absent Judicial Intervention, The Current Discriminatory Electoral System Will Remain in Place.**

66.    KISD's discriminatory at large voting system is a relic of the District's past and must be changed. Although "at-large . . . districting schemes are not per se unconstitutional . . . where the petitioner can demonstrate that 'its members had less opportunity than did other residents in the district to participate in the political processes and to elect legislators of their choice,' . . . such districting schemes are constitutionally infirm."[12]

67.    Across the country and in Texas, school districts with traditional at-large election systems have recognized, either voluntarily or through judicial intervention, the representational flaws in their voting structure and have adopted alternative voting structures, such as a cumulative voting system.

68.    A cumulative voting system, included in the Texas Education Code, enables each voter to cast a number of ballots, for any one or more candidates in the manner of their choosing, equal to the number of positions to be filled at the election (Tex. Educ. Code Ann. § 11.054 (b)-(c)). Through this structure, the minority population is granted access to the electoral process, and the possibility of the dilution of their votes is diminished. Under cumulative voting, each trustee remains beholden to the whole community, yet the system can promote trustees from the more disadvantaged communities within the district.

---

[12] *Zimmer v. McKeithen*, 485 F.2d 1297, 1304-05 (5th Cir. 1973) (internal citations omitted).

69.    Indeed, a "court could design an at-large election plan that awards seats on a cumulative basis, or by some other method that would result in a plan that satisfies the Voting Rights Act."[13]

70.    The KISD electoral system violates Section 2 of the Voting Rights Act and the Fourteenth and Fifteenth Amendments of the Constitution. Unless the Court directs KISD to adopt a cumulative voting system that does not unlawfully dilute the votes of minority voters, the current discriminatory system will persist.

## V.  CLAIMS

### A.    Count 1:  Racial Discrimination in Violation of Section 2 of the Voting Rights Act.

71.    Plaintiff realleges and incorporates by reference all prior paragraphs, as if fully set forth herein.

72.    Section 2 of the Voting Rights Act prohibits any standard, practice or procedure that results in the denial or abridgment of the right of minorities to vote. Specifically, it forbids any electoral system that denies Hispanics an equal opportunity to that afforded to other members of the electorate to elect representatives of their choice.

73.    The Hispanic voters within the KISD are politically cohesive and elections for the Board at issue reflect a clear pattern of racially polarized voting that allows the bloc of white voters to usually defeat the Hispanic community's preferred candidate. Indeed, the CVAP for voters of color is sizable enough for a cumulative voting system to allow Hispanics to potentially elect a candidate of their choosing for the KISD board, better reflecting the school district's demographics at the leadership level.

---

[13] *Branch v. Smith*, 538 U.S. 254, 310 (2003).

**ORIGINAL COMPLAINT SEEKING DECLARATORY**
**AND PERMANENT INJUNCTIVE RELIEF**                                    19

74.     Thus, KISD's at-large electoral system for electing its Board violates Section 2 of the Voting Rights Act, in that, under the totality of the circumstances, Plaintiff and minority voters are denied an equal opportunity to participate effectively in the political process, to elect candidates of their choice to the Board and to have any meaningful or significant influence in elections for the Trustees of the Board.

75.     Accordingly, Plaintiff requests that the Court issue a declaratory judgment stating that the KISD electoral system violates Section 2 of the Voting Rights Act.

**B.   Count 2: Racial Discrimination and Denial of Equal Protection in Violation of the Fourteenth and Fifteenth Amendments.**

76.     Plaintiff realleges and incorporates by reference all prior paragraphs, as if fully set forth herein.

77.     The Fourteenth Amendment provides: "No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

78.     Section 1 of the Fifteenth Amendment provides: "The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude."

79.     KISD's at-large voting system deprives Hispanics and other minority communities of equal protection of the law in violation of the Fourteenth and Fifteenth Amendments.

80.     Texas' long history and ongoing record of racial discrimination in the context of voting raises a strong inference of discriminatory purpose in violation of the Fourteenth Amendment. The recent efforts by members of the KISD Board to split the District into two districts - a racial and socio-economic segregation - further betrays this discriminatory purpose.

ORIGINAL COMPLAINT SEEKING DECLARATORY
AND PERMANENT INJUNCTIVE RELIEF                                                    20

81.     The at-large system has been maintained for a discriminatory purpose and has the effect of diluting, minimizing, and canceling out the voting strength of people of color in violation of the Fourteenth and Fifteenth Amendments to the Constitution.

**C.     Count 3: Injunctive Relief for Violations of the Voting Rights Act and Fourteenth and Fifteenth Amendments of the Constitution.**

82.     Plaintiff realleges and incorporates by reference all prior paragraphs, as if fully set forth herein.

83.     Unless enjoined, the KISD electoral system will remain in force and, therefore, KISD will continue to violate Section 2 of the Voting Rights Act and the Fourteenth and Fifteenth Amendments of the Constitution by administering, implementing, and conducting future elections for Board members utilizing that unlawful system.

84.     Without the Court's intervention, the Board's actions and the electoral system will cause minority non-white voters irreparable harm because the electoral system denies those voters the opportunity to fully participate in the electoral process by diluting the strength of their vote, for which there is no adequate remedy at law.

85.     Accordingly, Plaintiff requests that the Court enter a permanent injunction prohibiting Defendants from administering, implementing, and conducting future elections for the KISD Board based on the at-large electoral system. Such relief is authorized by the Voting Rights Act, the Constitution and principles of equity.

**D.     Count 4:  Request For Attorneys' Fees.**

86.     Plaintiff realleges and incorporates by reference all prior paragraphs, as if fully set forth herein.

87.     Because of KISD's unlawful electoral system, Plaintiff retained the undersigned counsel to present and prosecute the claims asserted herein.

**ORIGINAL COMPLAINT SEEKING DECLARATORY
AND PERMANENT INJUNCTIVE RELIEF**

88.     This action is a suit to enforce the voting guarantees of the Voting Rights Act. Pursuant to 52 U.S.C. § 10310(e) and 42 U.S.C. § 1988(b), Plaintiff is entitled to recover reasonable attorneys' fees, reasonable expert fees, and other reasonable litigation expenses as part of the costs for pursuing this lawsuit.

## VI.  REQUEST FOR RELIEF

In light of the foregoing, Plaintiff respectfully requests that this Court enter judgment in his favor and against all Defendants, providing for the following relief:

(a)     a judicial declaration that the at-large method for electing members to the KISD Board violates Section 2 of the Voting Rights Act;

(b)     a permanent injunction prohibiting KISD, its Trustees, agents, and all persons acting in concert with any of them, from administering, implementing, or conducting any future elections for the Board under an at-large electoral system;

(c)     set reasonable deadlines for KISD to propose and then implement a method that remedies the violations of Section 2 of the Voting Rights Act and the U.S. Constitution. Specifically, Plaintiff requests the remedies of cumulative voting and an on-cycle electoral system. If KISD fails to propose or implement such a plan by the Court's deadlines, the Court should order into effect a new election plan of its own, designed to remedy the violations of Section 2 and the U.S. Constitution, and order elections to be held pursuant to that plan as promptly as possible;

(d)     an order that all future elections for the KISD Board comply with Section 2 of the Voting Rights Act and the U.S. Constitution;

(e)   retain jurisdiction to render any and all further orders that this Court may deem necessary in order to ensure compliance;

(f)   an award of reasonable attorneys' fees, reasonable expert fees, and other reasonable litigation expenses pursuant to 52 U.S.C. § 10310(e) and 42 U.S.C. § 1988(b), and any other applicable statute;

(g)   an award of costs of Court; and

(h)   any other relief, at law or in equity, to which Plaintiff is entitled and this Court deems just and proper.

**ORIGINAL COMPLAINT SEEKING DECLARATORY
AND PERMANENT INJUNCTIVE RELIEF**                                    23

Respectfully submitted,

**BREWER STOREFRONT, PLLC**


By:*/s/Joshua H. Harris*
William A. Brewer III
State Bar No. 02967035
wab@brewerattorneys.com
Joshua H. Harris
State Bar No. 24127306
jkh@brewerattorneys.com

1717 Main Street
Suite 5900
Dallas, Texas 75201
Telephone: (214) 653-4000
Facsimile: (214) 653-1015

**ATTORNEYS FOR PLAINTIFF**