IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORTH WORTH DIVISION

| | | |
|---|---|---|
| CLAUDIO VALLEJO, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| KELLER INDEPENDENT SCHOOL | § | CIVIL ACTION NO. 4:25-cv-00138-O |
| DISTRICT AND ITS BOARD OF | § | |
| TRUSTEES CHARLES RANDKLEV, | § | |
| JOHN BIRT, JONI SHAW SMITH, | § | |
| MICAH YOUNG, CHELSEA KELLY, | § | |
| CHRIS COKER, and HEATHER | § | |
| WASHINGTON in their official capacity, | § | |
| | § | |
| Defendants. | § | |

## PLAINTIFF'S RESPONSE TO ORDER TO SHOW CAUSE

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................................... 2

PRELIMINARY STATEMENT ................................................................................................... 4

ARGUMENT ............................................................................................................................... 5

   I.   The Fifth Circuit's standard for the imposition of sanctions. ........................................... 6

   II.   The development and nature of Plaintiff's claims. ........................................................... 7

      A.   Pre-filing investigation ................................................................................................ 7

      B.   What the Plaintiff's investigation revealed. ................................................................ 8

   III.   Voting Rights Act claims were made in good faith based on reasonable interpretation of *Bartlett* and related cases. ................................................................................................. 10

      A.   *Gingles* and its progeny apply only to a common, but limited kind of Section 2 claim. 11

      B.   This understanding of *Gingles* and its progeny is consistent with the Fifth Circuit's decisions in Section 2 cases. ............................................................................................... 18

      C.   Cumulative voting is an appropriate remedy when it is not possible to create majority-minority voting districts. ....................................................................................................... 20

      D.   Cumulative voting is not equivalent to the creation of crossover, coalition or influence districts. ...................................................................................................................................... 23

   IV.   Plaintiff's Fourteenth and Fifteenth Amendment claims were made in good faith ...... 23

V.    This case does not meet the *Vaughan* standard for either fee shifting or the imposition of sanctions................................................................................................................ 25

CONCLUSION ......................................................................................................................... 26

## TABLE OF AUTHORITIES

**Cases**

*Bartlett v. Strickland*, 556 U.S. 1 (2009)................................................................................ passim

*Branch v. Smith*, 538 U.S. 254, 310 (2003) ................................................................................. 20

*Growe v. Emison*, 507 U.S. 25 (1993)........................................................................................... 13

*Holder v. Hall*, 512 U.S. 874, 910 (1994)................................................................................ 6, 20

*Johnson v. De Grandy,* 512 U.S. 997, 1020 (1994) ...........................................................9, 15, 16

*League of United Latin Am. Citizens #4552 (LULAC) v. Roscoe Indep. Sch. Dist.*, 123 F.3d 843, 847 (5th Cir. 1997)................................................................................................................ 26

*League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 428 (2006).................................. 21

*League of United Latin Am. Citizens, Council No. 4434 v. Clements*, 999 F.2d 831, 851 (5th Cir. 1993) ........................................................................................................................11, 25

*League of United Latin Am. Citizens, Dist. 19 v. City of Boerne*, 675 F.3d 433 (5th Cir. 2012) .. 21

*Magnolia B. Ass'n, Inc. v. Lee*, 994 F.2d 1143 (5th Cir. 1993) .................................................... 25

*Mo. State Conf. of the NAACP v. Ferguson-Florissant Sch. Dist.,* No. 4:14-cv-02077 (E.D. Mo. Dec. 21, 2016)........................................................................................................................ 21

*Perez v. Pasadena Indep. Sch. Dist.*, 165 F.3d 368, 372 (5th Cir. 1999) .............................. 18, 19

*Petteway v. Galveston Cnty.*, 111 F.4th 596, 603 (5th Cir. 2024) .................................... 18, 19, 20

*Reyes v. City of Farmers Branch, Tex.*, 586 F.3d 1019 (5th Cir. 2009) ........................................ 25

*Thornburg v. Gingles*, 478 U.S. 30, 87 (1986)........................................................................ passim

*U.S. v. Euclid City Sch. Bd.*, 632 F. Supp. 2d 740 (N.D. Ohio 2009) .......................................... 21

*U.S. v. Village of Port Chester,* 704 F.Supp.2d 411 (S.D.N.Y. 2010) ............................................ 21

*Vaughan v. Lewisville Indep. Sch. Dist.*, 62 F.4th 199, 206 (5th Cir. 2023) ............................. 6, 24

*Veasey v. Abbott,* 830 F.3d 216, 235–36 (5th Cir. 2016) ......................................................... 24

*White v. Regester*, 412 U.S. 755, 764 (1973) ....................................................................... 5, 13

## Statutes

52 U.S.C. §10301(b) ................................................................................................................. 9

## Other Authorities

Adam B. Cox & Thomas J. Miles, *Judicial Decisionmaking and the Transformation of Voting Rights*

    *Doctrine*, 29 J.L. Econ. & Org. 108 (2013) ......................................................................... 8

Danielle Lang & J. Gerald Hebert, *A Rose by Any Other Name Would Smell as Diluted: The Eleventh*

    *Circuit's Remedy-Centered Vote Dilution Jurisprudence,* 72 Mercer L. Rev. 1245 (2021) ................... 8

Hearings on the Voting Rights Act Before the Subcomm. on the Constitution of the Senate

    Comm. of the Judiciary, 97th Cong., 2d Sess. 1367–68 (statement of Prof. Drew Days) .........11

U.S. Dep't of Justice, *Guidance under Section 2 of the Voting Rights Act,* 52 U.S.C. § 10301 (Apr. 2024).. 7

Plaintiff, Claudio Vallejo and his counsel respond to the Court's Order to Show Cause of January 15, 2026, as follows:

## PRELIMINARY STATEMENT

This lawsuit was not filed lightly. Plaintiff's counsel spent more than 250 hours researching the facts and analyzing the applicable legal principles upon which the lawsuit is based.[1] The Lawsuit was filed to address the real problems faced by Mr. Vallejo as a concerned Hispanic voter[2] and observed by others active in District politics.[3] It was based on years of success appropriately using the Voting Rights Act to give minority groups an equal opportunity to participate in the political process.[4] Finally, it was not filed precipitously, but only after offering the Defendant an opportunity to work toward a solution.[5]

The lawsuit is founded on a principle Plaintiff and his counsel believe is perfectly consistent with the text, history, and case law concerning Section 2 of the Voting Rights Act; that is, when the facts show a minority group has been denied the equal opportunity to participate in the political process and to elect representatives of their choice because of race or color, the Voting Rights Act provides a remedy. Plaintiff does not contend that Keller ISD's at-large electoral system is per se unlawful, nor does he seek the creation of a crossover, coalition or influence voting district of the kind foreclosed by *Bartlett v. Strickland*. Instead, Plaintiff makes the reasonable argument that the *Gingles* preconditions only apply when the electoral system in and of itself is claimed to

---

[1] Appendix p. 2, Affidavit of Josh Harris.
[2] Appendix p. 174, Affidavit of Claudio Vallejo.
[3] Appendix p. 189, Affidavit of Dixie Davis.
[4] Appendix pp. 166, 169, 172, the affidavits of Rafael Anchía, Guillermo Ramos, and Elizabeth Villafranca describing the work and success of the Brewer Storefront and its impact on Hispanic voting rights, and p. 8, list of cases filed by the Brewer Storefront.
[5] Appendix pp. 14, 179, Exhibits to the Affidavits of Claudio Vallejo and Josh Harris.

deny equal opportunity and the remedy sought is the creation or redrawing of a voting district. The *Gingles* preconditions are simply not applicable to a cumulative voting case. Neither the Supreme Court nor the Fifth Circuit has rejected this legal argument and there is, therefore, no basis for fee shifting or sanctions.

## ARGUMENT

Plaintiff's First Amended Complaint uses the phrase "vote dilution," but this is not a case about vote dilution in the way the Supreme Court and other courts use the phrase. As used by the Supreme Court:

> The phrase "vote dilution," in the legal sense, simply refers to the impermissible discriminatory effect that a multimember or other districting plan has when it operates "to cancel out or minimize the voting strength of racial groups."

*Thornburg v. Gingles*, 478 U.S. 30, 87 (1986).[6] Under this definition, "vote dilution" occurs when the electoral system, in and of itself, has a discriminatory effect; that is, beyond the structure of the electoral system no other facts support the basic Voting Rights Act claim that:

> the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

52 U.S.C. §10301. The Plaintiff's claim in this case is that Section 2 has been violated in the Keller ISD not by the structure of the electoral system in and of itself, but by the combination of the staggered at-large voting system and the totality of the circumstances that deprive Hispanic voters of an equal opportunity to participate in the political process and elect the candidate of their choice. This is not a traditional "vote dilution" claim.

---

[6] Justice O'Connor, joined by Justices Burger, Powell and Rehnquist, concurring, quoting, in part, *White v. Regester*, 412 U.S. 755, 764 (1973).

Equally important, *Gingles* and its progeny were decided with a single remedy on the table; that is, the drawing or redrawing of voting district lines.[7] This case differs from the *Gingles* line of cases because the remedy sought is cumulative voting. As will be seen, the absolute majority-minority rule finally expounded in *Bartlett v. Strickland*, 556 U.S. 1 (2009) was addressed to the very specific problems faced by the courts when a Section 2 violation is to be remedied by the creation or revision of voting districts. The reasoning in *Bartlett* simply does not apply when a different remedy like cumulative voting is sought. This Court may not think the Fifth Circuit or Supreme Court would ultimately recognize the difference between this case seeking a cumulative voting remedy and earlier cases proposing a remedy based on creating or modifying voting districts, but that difference is inherent in the Supreme Court's jurisprudence and consistent with decisions from the Fifth Circuit. It is not baseless or frivolous.

## I.     The Fifth Circuit's standard for the imposition of sanctions.

The Fifth Circuit has previously addressed the propriety of sanctions against the plaintiff and counsel in a Voting Rights Act case. It began its discussion with the observation that sanctions against a lawyer who advances an untested legal theory runs the risk of " dampening the legitimate zeal of an attorney in representing her client." *Vaughan v. Lewisville Indep. Sch. Dist.*, 62 F.4th 199, 207 (5th Cir. 2023). It then held that sanctions were appropriate only when existing precedent squarely foreclosed the claim and it was not made to extend existing law:

> We conclude that sanctions against Vaughan were unwarranted because precedent
> in this circuit did not squarely foreclose his legal argument and because he sought
> to extend existing law. Critically, LISD points to no precedent in this circuit

---

[7] The Supreme Court's focus on the creation of minority-majority districts is not inherent in the Voting Rights Act but is instead the consequence of a focus on this specific remedy for political reasons. Justice Thomas observed in his concurring opinion in *Holder v. Hall*, 512 U.S. 874, 910 (1994) that: "In the cases that have come before us, plaintiffs have focused largely upon attacking multimember districts and have offered single-member schemes as the benchmark of an "undiluted" alternative"

considering whether a voter in his position has standing under the VRA, let alone "squarely controlling precedent." No court of appeals has considered this question, and we found only a single out-of-circuit district court opinion analyzing the issue.

Id. at 206 (5th Cir. 2023). Plaintiff's claim is straightforward. Where there is evidence that a minority has been effectively excluded from the political process in an at-large or multi-member electoral system and the remedy sought is cumulative voting, a Section 2 violation may be proved by means other than demonstrating a hypothetical majority-minority district. The Court may believe the Supreme Court or Fifth Circuit precedents make it unlikely this argument will prevail, but no Fifth Circuit or Supreme Court case has addressed it and so it has not been it has not been squarely foreclosed by existing precedent as an extension – not a modification, but an extension – of existing law.

## II.     The development and nature of Plaintiff's claims.

### A.     Pre-filing investigation

Before filing this action, Plaintiff's counsel conducted a sustained pre-filing investigation into Keller ISD's method of electing its Board of Trustees and the applicable legal principles, including the application of Section 2 of the Voting Rights Act to that electoral structure. That investigation included an extensive factual review and legal assessment by multiple attorneys and legal staff.[8] The investigation included review of publicly available demographic and electoral materials, including multi-year American Community Survey citizen voting-age population data, state-reported student demographic data, historical Keller ISD trustee election results, and materials describing the District's at-large, numbered-place election system, as well as analysis of demographic trends, prior electoral outcomes, and the operation of at-large election systems in comparable jurisdictions.

---

[8] Appendix p. 2, Declaration of Josh Harris.

As part of that assessment, counsel also considered enforcement guidance and legal scholarship recognizing a longstanding debate over how the *Gingles* framework—developed in the context of district-based vote dilution—applies to certain at-large or non-districted election systems. *See, e.g.*, U.S. Dep't of Justice, *Guidance under Section 2 of the Voting Rights Act,* 52 U.S.C. § 10301 (Apr. 2024) (emphasizing that Section 2 analysis is fact-intensive and dependent on the method of election); Danielle Lang & J. Gerald Hebert, *A Rose by Any Other Name Would Smell as Diluted: The Eleventh Circuit's Remedy-Centered Vote Dilution Jurisprudence,* 72 Mercer L. Rev. 1245 (2021) (discussing tensions between traditional *Gingles* analysis and challenges to at-large election systems); Adam B. Cox & Thomas J. Miles, *Judicial Decisionmaking and the Transformation of Voting Rights Doctrine,* 29 J.L. Econ. & Org. 108 (2013) (documenting evolution in courts' application of *Gingles* over time).

B.     **What the Plaintiff's investigation revealed.**

The Plaintiff's pre-suit investigation revealed two things. First, there was a history of polarized voting in the Keller ISD and other forms of exclusion from the political process that denied Hispanic voters the equal opportunity to participate in the political processes leading to the nomination or election of candidates. Second, the District itself served White students far better than it served Hispanic students. This lawsuit rests on the belief of the Plaintiff and his counsel that where there is a Section 2 wrong – in this case the denial of equal opportunity to participate in the political process as evidenced by the denial of equal opportunity for Hispanic students – there is a Section 2 remedy.

Hispanic voters make up 15.7% of the voting population of Keller ISD, which uses staggered at large voting. There has not been a successful Hispanic candidate for the school board since 1999. *There is no reason to think there ever will be*. In a thorough analysis of voting patterns

in the Keller ISD by Dr. Matt A. Barreto[9] he found that racially polarized voting is prevalent in local elections and the Keller ISD.[10] He also found extensive evidence that the other "Senate Factors" applied to elections in the Keller ISD.[11] The Plaintiff's claims ultimately rest on extensive evidence that:

> the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

52 U.S.C. §10301(b).

Dr. Barreto's report only confirms what a glance at the history of elections in the Keller ISD and the way the District serves Hispanic students will show. Whites make up 67.5% of the voting population and a White candidate can win every election without Hispanic support. Moreover, with respect to school-related issues there is no reason for any candidate or segment of the White voting population to respond to the concerns of Hispanic voters. White teachers are disproportionately represented in the District when compared to the number of White students and White students do much better on standardized tests for academic accomplishment and college readiness than Hispanic students. With a majority of voters and a school district that serves their children well, White voters have no reason to engage Hispanic voters in the "pull, haul, and trade to find common political ground" that is practical politics.[12] School district elections are about students and their success and White voters have no reason to pay attention to Hispanic votes and voters. It is that problem this lawsuit addresses.

_____

[9] Appendix p. 18, Barreto Report.
[10] Appendix p. 27, Barreto Report page 10.
[11] Appendix p. 74, Barreto Report Appendix C.
[12] *Johnson v. De Grandy,* 512 U.S. 997, 1020 (1994)

The ordinary solution to this kind of political problem is the creation of single member majority-minority districts that allow minority groups to elect candidates of their choice in numbers that reflect their relative size in the voting population. However, this solution only works if two conditions are met. First, minority voters must be geographically concentrated so that a reasonably compact district can be created. Second, the number of minority voters in a geographically compact area must constitute a majority within that district. These conditions are not met in the Keller ISD because the District is not geographically segregated.

Rather than conclude the Voting Rights Act provides no remedy for the denial of equal opportunity based on race or color in the absence of geographic segregation, Vallejo chose to pursue a different remedy, cumulative voting. That remedy demands a different standard of liability that comports with the plain meaning of Section 2. His lawsuit proposes nothing more than that Hispanic voters who are denied an equal opportunity to participate in the political process because of their race or ethnicity have a remedy under Section 2. Plaintiff must prove that denial as a matter of fact, but as shown below, neither *Bartlett* nor its predecessors or successors foreclose a Section 2 claim just because it is not possible to demonstrate a hypothetical majority-minority voting district.

### III.    Voting Rights Act claims were made in good faith based on reasonable interpretation of *Bartlett* and related cases.

The Supreme Court's decision in *Bartlett* does not, on its face, foreclose the claims made in this lawsuit. *Bartlett* can be reasonably read to hold that proof of the ability to create a majority-minority district is required to prove a violation of Section 2 only when three circumstances are present. First, the Section 2 claim must rest entirely on the structure of the electoral system[13] in

_____

[13] In this Response "electoral system" is used as a shorthand for how a political entity counts votes and divides voters geographically for voting purposes. Cumulative voting, at-large, at-large

and of itself. Second, the proposed remedy must be the creation or revision of single-member districts. Finally, it must be true as a matter of fact that the minority in question is able to "have the opportunity to join other voters—including other racial minorities, or whites, or both—to reach a majority and elect their preferred candidate." The Court may not agree that *Bartlett* is subject to these limitations, but the Plaintiff and his counsel could reasonably believe that *Bartlett* and related precedents do not foreclose the legal argument made by the Plaintiff; that is, that a Section 2 violation may be proved for an at-large electoral system without proof of the first *Gingles* preconditions "where a combination of public activity and private discrimination have joined to make it virtually impossible for minorities to play a meaningful role in the electoral process"[14] and cumulative or limited voting is proposed as a remedy.

A.     *Gingles* **and its progeny apply only to a common, but limited kind of Section 2 claim.**

The Supreme Court's decision in *Bartlett v. Strickland*, 556 U.S. 1 (2009) stands for a relatively limited proposition; that is, if the plaintiff claims a minority's votes have been submerged or diluted by the structure of the electoral system at issue, *and* as a matter of fact the minority has been denied an equal opportunity to participate in the political process, *and* the plaintiff seeks the creation or redrawing of voting district lines, then the plaintiff must show that a majority-minority district can be drawn. When there is evidence that equal opportunity has been denied and the remedy sought is cumulative voting *Barlett* and its predecessors do not apply.

---

with staggered voting, single member district and multi-member district schemes are all "electoral systems."

[14] *League of United Latin Am. Citizens, Council No. 4434 v. Clements*, 999 F.2d 831, 851 (5th Cir. 1993) [quoting Hearings on the Voting Rights Act Before the Subcomm. on the Constitution of the Senate Comm. of the Judiciary, 97th Cong., 2d Sess. 1367–68 (statement of Prof. Drew Days)]

This is best understood by looking at the apparent dilemma faced by the Supreme Court in

*Thornburg v. Gingles*, 478 U.S. 30, 48 (1986). The Court had:

> long recognized that multimember districts and at-large voting schemes may operate to minimize or cancel out the voting strength of racial [minorities in] the voting population.'

478 U.S. at 47 [citations omitted]. It also noted that:

> The theoretical basis for this type of impairment is that where minority and majority voters consistently prefer different candidates, the majority, by virtue of its numerical superiority, will regularly defeat the choices of minority voters.

478 U.S. at 48. At the same time, the Court was constrained to recognize that: "[m]ultimember districts and at-large election schemes, however, are not per se violative of minority voters' rights." *Id.* The Court had to find a way to determine whether the theory of vote submersion was matched by the facts in cases like the one before it in which the remedy sought was the creation of new or different voting districts.

The Court began with this observation about the Senate Factors that should inform every claim under Section 2:

> While many or all of the factors listed in the Senate Report may be relevant to a claim of vote dilution through submergence in multimember districts, unless there is a conjunction of the following circumstances, the use of multimember districts generally will not impede the ability of minority voters to elect representatives of their choice.

478 U.S. at 48 (1986). In other words, *Gingles* addresses whether the multi-member or at large electoral system in question violates Section 2 by its very nature. The *Gingles* factors are presented as preconditions to a specific, narrow claim concerning the form of voting:

> These circumstances are necessary preconditions for *multimember districts to operate to impair minority voters' ability to elect representatives of their choice* for the following reasons. First, the minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district. If it is not, as would be the case in a substantially integrated

district, the multi-member form of the district cannot be responsible for minority voters' inability to elect its candidates.

478 U.S. at 50 [emphasis added]. *Gingles* thus asks whether it is "the use of multimember districts" that is responsible for the inability of minority voters to elect their candidates and therefore violates Section 2. The answer in *Gingles* is simple: the multi-member form of a district does not, *in and of itself,* violate Section 2 unless a majority-minority single member district can be formed. Notably though, this answer is given in the context of a demand for the creation of such voting districts and the narrow legal meaning of vote dilution found in the Supreme Court's decision in *White v. Regester*, 412 U.S. 755 (1973).

In *Growe v. Emison*, 507 U.S. 25 (1993) the Supreme Court expanded the *Gingles* preconditions to cases involving a single-member districting scheme:

> We have not previously considered whether these *Gingles* threshold factors apply to a § 2 dilution challenge to a single-member districting scheme, a so-called "vote fragmentation" claim. . . We have, however, stated on many occasions that multimember districting plans, as well as at-large plans, generally pose greater threats to minority-voter participation in the political process than do single-member districts.

The Court concludes that what applies to finding a violation of Section 2 in a multi-member plan or at-large plan applies as well to changes in single-district plans:

> It would be peculiar to conclude that a vote-dilution challenge to the (more dangerous) multimember district requires a higher threshold showing than a vote-fragmentation challenge to a single-member district. Certainly the reasons for the three *Gingles* prerequisites continue to apply: The "geographically compact majority" and "minority political cohesion" showings are needed to establish that the minority has the potential to elect a representative of its own choice in some single-member district,

507 U.S. at 40. In *Gingles* the question was whether multi-member districting as such violated Section 2. In *Growe* the question was whether a particular single-member district plan violated Section 2. Together *Gingles* and *Growe* stand for the proposition that in the usual vote dilution

claim if it is the electoral system itself that violates Section 2 then the *Gingles* preconditions must be met. However, *Growe* goes on to make it clear that the *Gingles* preconditions are directly tied to the nature of the remedy sought. "Unless these points are established, there neither has been a wrong nor can be a remedy." 507 U.S. at 40-41. The electoral system can be the problem in and of itself only if the problem can be solved by the remedy demanded by the plaintiff. Otherwise, the disconnect between the electoral system and the remedy indicates that the problem is not the electoral system in and of itself. However, neither *Gingles* nor *Growe* considered cumulative voting as a potential remedy. The *Gingles* preconditions and the argument "[t]here neither has been a wrong nor can there be a remedy" only made sense because in those cases because the remedy sought was the creation of single-member districts (in *Gingles*) or the re-drawing of district lines (in *Growe*).

*Bartlett* considered a variation on the question presented in *Gingles* and *Growe.* In *Bartlett* demographic changes made African-American voters a minority in what had been a majority-minority legislative district (District 18, including Pender County). The North Carolina constitution required that districts be based on county lines (the Whole County provision), but when re-drawing districts the Legislature divided Pender County to create a new District 18 that had a larger percentage of African-American voters than Pender County itself. However, this new district still did not have a majority of African-American voters. The Legislature justified the district on the ground that the new District 18 was a "crossover" district in which African-American voters would have sufficient electoral power to elect the candidate of their choice if helped by cross-over voters who were White or of other minority groups. The case came to the Supreme Court in a peculiar posture; the defendants were advocating for the crossover district as

a requirement of Section 2 in derogation of the state constitution while the plaintiffs claimed Section 2 did not require a crossover district and the Whole County rule had to be followed.

The discussion of *Gingles* and Section 2 in *Bartlett* confirms that the first *Gingles* precondition is a test for whether an electoral scheme violates Section 2 in and of itself, not a test for whether there has been any violation of Section 2 at all.[15] The Court first observes that Section 2 applies when minorities "have less opportunity than other members of the electorate to ... elect representatives of their choice." *Bartlett*, 556 U.S. at 11.It then defines opportunity in terms of the ability to join with other voters to reach a majority and elect their preferred candidate:

> But because they form only 39 percent of the voting-age population in District 18, African–Americans standing alone have no better or worse opportunity to elect a candidate than does any other group of voters with the same relative voting strength. That is, African–Americans in District 18 have the opportunity to join other voters—including other racial minorities, or whites, or both—to reach a majority and elect their preferred candidate.

*Bartlett,* 556 U.S. at 18. Following this observation about the facts, the Court recognizes as a general principle the observation in *De Grandy* that: "[M]inority voters are not immune from the obligation to pull, haul, and trade to find common political ground." *De Grandy*, 512 U.S., at 1020. In other words, Section 2 guarantees an equal opportunity "to pull, haul, and trade to find common political ground." This simply follows the language of the statute, which states that a violation may be established with proof that members of the group have "less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice."[16] The goal is equal opportunity to elect a candidate, not the absolute ability to elect a candidate that other non-minority voters do not want.

---

[15] As the Court observed in *Gingles,* "Section 2 prohibits all forms of voting discrimination, not just vote dilution." 478 U.S. at 45, n. 10.

[16] 52 U.S.C. §10301(b)

After establishing that equal opportunity is the ultimate test for a violation of Section 2, the *Bartlett* Court turns to the question of whether proof of the ability to form a crossover district might be sufficient to prove the redistricting scheme at issue violated Section 2 in and of itself. It concludes that such a test is impractical:

> Unlike any of the standards proposed to allow crossover-district claims, the majority-minority rule relies on an objective, numerical test: Do minorities make up more than 50 percent of the voting-age population in the relevant geographic area? That rule provides straightforward guidance to courts and to those officials charged with drawing district lines to comply with §2.

556 U.S. at 18-19. In other words, a single member, multi-member or at-large district can in and of itself be found to violate Section 2 only if it is possible to create a majority-minority district. But it is important to note that the Court prefers this absolute rule not because it somehow demonstrates the existence or non-existence of equal opportunity, but because it "provides straightforward guidance to courts and to those officials charged with drawing district lines to comply with §2." *Bartlett*, 556 U.S. at 18. This justification applies only when the remedy sought is drawing or redrawing of voting district lines. Courts asked to engage in judicial redistricting need the majority-minority rule to avoid complex arguments about when a particular proposed voting district in fact provides equal opportunity through the ability to form coalitions or take advantage of crossover voting. *For Courts that are not asked to draw district lines this justification simply does not apply.*

*Bartlett's* concern for finding a simple to apply rule where the creation or revision of voting districts is at issue makes perfect sense because the creation of majority-minority districts necessarily represses the votes of those majority voters whose votes have been deliberately swamped by the creation of the voting district, creating a tension between the Voting Rights Act

and the Equal Protection Clause that cumulative voting avoids. As the Court observed in *De Grandy:*

> It bears recalling, however, that for all the virtues of majority-minority districts as remedial devices, they rely on a quintessentially race-conscious calculus aptly described as the "politics of second best."

*De Grand*y, supra 512 U.S. at 1020. The point of the Voting Rights Act was to "hasten the waning of racism in American politics." Majority-minority districts hinder rather than hasten the waning of racism because they institutionalize race-conscious political calculations. The dangers associated with the creation of majority-minority districts justify "straightforward guidance" to avoid Section 2 becoming a mechanism to promote, rather than eliminate discrimination. *Id.*

*Bartlett's* insistence on the demonstration of majority-minority districts also makes sense because in *Bartlett* the trial court had already found as a matter of fact that African-American voters had an opportunity equal to the portion of voters who were African-American. As the Court wrote:

> the trial court concluded that, although African–Americans were not a majority of the voting-age population in District 18, the district was a "de facto" majority-minority district because African–Americans could get enough support from crossover majority voters to elect the African–Americans' preferred candidate."

556 U.S. at 9. The difference between the percentage of African-American voters in the proposed District 18 (39.3%) and the county wide district (35.33%) scarcely suggested that in the proposed District 18 African-American voters would have more opportunity working with crossover voters than in the county-wide district. African-American voters already had the opportunity promised by Section 2; to give them more would have been to create an advantage, not equality. "Section 2 does not guarantee minority voters an electoral advantage." 556 U.S. at 20.

*Bartlett* was a practical decision about how to prove Section 2 liability when there was already a fact finding that minority voters had an equal opportunity to engage in the political

process and the remedy sought was the creation of a new voting district that might improve but would not guarantee electoral success. The case before this Court is different. It cannot be said as a matter of fact that Hispanic voters "have no better or worse opportunity to elect a candidate than does any other group of voters with the same relative voting strength."[17] The facts have not been developed. Plaintiff has, however, plausibly alleged that Hispanics have a worse opportunity based on their complete lack of electoral success, the history of polarized voting and, perhaps most important, the demonstrated failure of the District to serve Hispanic students as well as its serves White students. When politicians – and school board members are ultimately politicians – ignore the needs of a constituency like Hispanic voters the most reasonable inference is that Hispanic voters do not have the same opportunity as other similarly sized groups to "join other voters— including other racial minorities, or whites, or both—to reach a majority and elect their preferred candidate." *Bartlett*, 556 U.S. at 14. The Plaintiff also requests a remedy that creates equal opportunity without the creation of majority-minority districts, therefore avoiding the need for an "objective numerical test" to decide where to draw voting district boundaries. This relief is consistent with *Barlett* and the Supreme Court's discussion of equal opportunity more generally.

> **B.** **This understanding of *Gingles* and its progeny is consistent with the Fifth Circuit's decisions in Section 2 cases.**

The Fifth Circuit's decisions in *Petteway v. Galveston Cnty.*, 111 F.4th 596, 603 (5th Cir. 2024) and *Perez v. Pasadena Indep. Sch. Dist.*, 165 F.3d 368, 372 (5th Cir. 1999) are not inconsistent with the above reading of *Bartlett*.

In *Perez* the Hispanic plaintiffs challenged staggered term at-large voting for the Pasadena ISD school board. The issue before the Fifth Circuit was whether the District Court erred by

---

[17] 556 U.S. at 18

considering only citizens, and therefore potential voters, when determining whether there could be a majority-minority district. The Fifth Circuit agreed with the District Court that only citizens were to be considered and that because no majority-minority district could be created taking citizenship into account the first *Gingles* prerequisite had not been met. Neither the District Court nor the Court of Appeals considered any issue other than whether the specific geographic makeup of the voting districts might violate Section 2. As noted above, when the inquiry is limited to whether the electoral system in and of itself violates Section 2 and the only remedy sought is some kind of redistricting then *Gingles* applies because if the electoral system cannot be fixed by the remedy sought any lack of opportunity does not come from the electoral system itself.

In *Petteway* the issue before the District Court and Fifth Circuit was whether minorities could be aggregated to prove the existence of a hypothetical majority-minority district. The Court's holding was specific:

> "Section 2 does not require political subdivisions to draw precinct lines for the electoral benefit of distinct minority groups that share political preferences but lack the cementing force of race or ethnicity.

*Petteway v. Galveston Cnty.*, 111 F.4th 596, 614 (5th Cir. 2024). Like *Perez, Petteway* dealt with a specific issue within the *Gingles* analysis; that is, who is counted when trying to create a hypothetical majority-minority district. Neither *Perez* nor *Petteway* addresses the question posed by this Lawsuit; that is, whether there is a Section 2 violation when as a matter-of-fact minority voters are denied an equal opportunity to engage in the political process because of circumstances that go beyond the mere structure of the electoral system. What if the problem is not merely vote dilution as narrowly defined in *White v. Regester*, but instead a more basic denial of the opportunity to participate in the "to pull, haul, and trade" of politics? That question has not yet been answered by the Fifth Circuit.

### C. Cumulative voting is an appropriate remedy when it is not possible to create majority-minority voting districts.

*Gingles* measured the existence of a Section 2 violation by the existence of a remedy for the alleged violation, holding that if an electoral system cannot be re-structured to create equal opportunity – crudely defined as the absolute ability to win an election - then the electoral system in and of itself does not violate Section 2. *Barlett,* for practical reasons, rejected remedies that redraw district lines to enhance minority opportunity without creating majority-minority districts. *Bartlett* does not hold, however, that the only remedy available under Section 2 is drawing or redrawing voting district lines; in fact, such a holding would do violence to Section 2's explicit provision that it does not guarantee proportional representation. Cumulative voting is a remedy explicitly authorized by the Texas Legislature (Texas Elections Code §11.054), and one that conservative and more liberal members of the Supreme Court have vigorously advocated:

> nothing in our present understanding of the Voting Rights Act places a principled limit on the authority of federal courts that would prevent them from instituting a system of cumulative voting as a remedy under § 2, or even from establishing a more elaborate mechanism for securing proportional representation based on transferable votes.

*Holder v. Hall*, 512 U.S. 874, 910 (1994) (Justices Thomas and Scalia, concurring in the judgment of the Court). "[A] court could design an at-large election plan that awards seats on a cumulative basis, or by some other method that would result in a plan that satisfies the Voting Rights Act." *Branch v. Smith*, 538 U.S. 254, 310 (2003) (O'Connor and Thomas, concurring in the judgment of the Court).

When a remedy other than one based on drawing or redrawing voting district lines is available, the existence of a Section 2 violation must be measured by that alternative remedy. Justice O'Connor, in her concurring opinion in *Holder v. Hall*, wrote that:

> "There is an inherent tension between what Congress wished to do and what it wished to avoid—between Congress' intent to allow vote dilution claims to be

brought under Section 2 and its intent to avoid creating a right to proportional representation for minority voters."

512 U.S. 874, 887 (1994) (O'Connor, J., concurring in judgment). The Fifth Circuit recognized this tension in *Petteway v. Galveston Cnty.*, 111 F.4th 596, 603 (5th Cir. 2024), referring to the tension between coalition claims and the "proviso against proportional representation and with the purposes of the Voting Rights Act." Majority-minority districts ignore this tension and create a guaranteed win for minorities despite the Supreme Court's insistence that the goal of Section 2 is about equality of opportunity: "We have said that "the ultimate right of §2 is equality of opportunity, not a guarantee of electoral success for minority-preferred candidates of whatever race." *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 428 (2006).

Cumulative voting as a remedy for Section 2 violations is not merely a theory. At least 40 lawsuits seeking a cumulative voting remedy have been filed in Texas under the Voting Rights Act.[18] Alternative vote counting as a means to create equal opportunity has been ordered by at least three District Courts. In *U.S. v. Euclid City Sch. Bd.*, 632 F. Supp. 2d 740 (N.D. Ohio 2009) the parties had stipulated to Section 2 liability but disagreed on the appropriate remedy. The Justice Department favored the creation of single member districts to replace an existing system with staggered terms from an at-large district identical to that used by the Keller ISD. The Board preferred either a cumulative or a limited voting system.[19] The Court found that there were good reasons for school board elections to be at-large with staggered terms and that the appropriate remedy was a limited voting system. 632 F. Supp. at 758-759. *U.S. v. Village of Port Chester,* 704

_____

[18] Appendix p. 183, Declaration of Deborah Otis, Director of Research and Policy for FairVote.
[19] In a cumulative voting system, each voter gets as many votes as there are candidates. In a limited voting system, each voter gets one vote per election and can only select one candidate to vote for. Like cumulative voting it permits a minority to exercise more political power by casting all its votes for a single candidate.

F.Supp.2d 411 (S.D.N.Y. 2010) also adopted cumulative voting as a remedy over the objection of the plaintiff, as did the District Court in *Mo. State Conf. of the NAACP v. Ferguson-Florissant Sch. Dist.,* No. 4:14-cv-02077 (E.D. Mo. Dec. 21, 2016) (unreported order). In addition, dozens of voting rights cases have been settled by implementing cumulative voting.[20]

These cases demonstrate that alternative voting systems can be a viable remedy when minority voters do not have an opportunity similar to that of other similarly sized groups to participate in the political process and elect the candidate of their choice. *Gingles*, *Growe, Bartlett* and similar Supreme Court cases are best understood as addressing those situations in which the only proposed remedy for an inequality of opportunity is the creation of majority-minority districts. The general rule must, however, be that where Section 2 is violated by a denial of equal opportunity there is a remedy that creates equal opportunity to participate in the electoral system even if it cannot guarantee electoral success. In this case the Plaintiff has credibly alleged that a cumulative voting system will provide equal opportunity for Hispanic voters to participate in the political process and have an equal opportunity to elect the candidate of their choice. It does not guarantee they will be able to elect the candidate of their choice, but nothing in the Voting Rights Act suggests the existence of a guarantee is a prerequisite to a denial of equal opportunity. The Plaintiff's allegations remain to be proved, but they are credible and this case was brought in good faith with the reasonable belief that *Bartlett* is limited by the District Court's finding in that case that African-American voters in fact had equal opportunity and by the fact that the *Bartlett* Court considered only the creation of a majority-minority voting district as a remedy.

---

[20] Appendix p. 162, case list. Among them is *League of United Latin Am. Citizens, Dist. 19 v. City of Boerne*, 675 F.3d 433 (5th Cir. 2012).

**D. Cumulative voting is not equivalent to the creation of crossover, coalition or influence districts.**

*Bartlett's* rejection of crossover, coalition or influence districts was based on the difficulty of determining as a matter of fact whether such districts would create equal opportunity combined with the danger, always present when voting districts are drawn along racial and ethnic lines, that the beneficial effect in terms of equality of opportunity would be outweighed by the negative effect of creating further segregation and racial polarization. Neither of these factors exists when the remedy sought is cumulative voting. The court need not speculate as to whether a minority group will in fact be able to attract crossover voters or create political coalitions; the proof will be in the outcome of future elections. Limited and cumulative voting allow a minority within the voting population to put all their support behind a single candidate and, in a 3/3/2 system like that in the Keller ISD reach an effective percentage of the vote for that candidate that will, like the 35.4% of the votes for African-American voters in *Bartlett*, raise the political power of Hispanic voters to the point that politicians cannot blithely ignore the needs of Hispanic children. At the same time, it does not create an advantage for minority voters when compared to any similarly sized group. Every group, whether defined by race, ethnicity, religion, or a specific view of how children can be educated has exactly the same opportunity through cohesive voting to become more important to the politicians seeking their votes. *Bartlett* rejected crossover, coalition and influence districts for reasons that simply are not present in an electoral system that uses cumulative voting.

**IV. Plaintiff's Fourteenth and Fifteenth Amendment claims were made in good faith**

Plaintiff's 14th and 15th Amendment claims were made in good faith for exactly the same reasons his Voting Rights Act claims were made in good faith. It is certainly true that claims under the Fourteenth and Fifteenth Amendments require proof of intent, but the Fifth Circuit holds, consistent with the applicable Supreme Court authorities:

"[D]iscriminatory intent need not be proved by direct evidence." *Rogers v. Lodge*, 458 U.S. 613, 618, 102 S.Ct. 3272, 73 L.Ed.2d 1012 (1982); *Brown*, 561 F.3d at 433 ("To find discriminatory intent, direct or indirect circumstantial evidence, including the normal inferences to be drawn from the foreseeability of defendant's actions may be considered." (citation omitted)). Instead, courts may consider both circumstantial and direct evidence of intent as may be available. . ..

In this day and age we rarely have legislators announcing an intent to discriminate based upon race, whether in public speeches or private correspondence. To require direct evidence of intent would essentially give legislatures free rein to racially discriminate so long as they do not overtly state discrimination as their purpose and so long as they proffer a seemingly neutral reason for their actions. This approach would ignore the reality that neutral reasons can and do mask racial intent, a fact we have recognized in other contexts that allow for circumstantial evidence.

*Veasey v. Abbott,* 830 F.3d 216, 235–36 (5th Cir. 2016). In this case two facts are undisputed. First, the Keller ISD Board did in fact propose a detachment plan that would have further divided the District along socio-economic lines. Second, that the scheme was scrapped only after this lawsuit was filed. The fact that the Board changed course when it was caught does not prove there was no intent to discriminate; instead, it allows the very real inference that discrimination was the intent but the Board abandoned it when caught. In any event, the appropriate inference depends on the development of facts that can only occur in discovery or at trial.

As for the requirement that the plaintiff "prove" a discriminatory effect, for the reasons discussed above *Bartlett* and its predecessors do not foreclose as a matter of the Plaintiff's claim that "a combination of public activity and private discrimination have joined to make it virtually impossible for minorities to play a meaningful role in the electoral process"[21] in the Keller ISD. The Court may find, after trial, that the claims have not been proven, but for all the reasons

---

[21] *League of United Latin Am. Citizens, Council No. 4434 v. Clements*, 999 F.2d 831, 851 (5th Cir. 1993) [quoting Hearings on the Voting Rights Act Before the Subcomm. on the Constitution of the Senate Comm. of the Judiciary, 97th Cong., 2d Sess. 1367–68 (statement of Prof. Drew Days)]

discussed above they were made in good based on an extensive investigation of the facts, a reasonable reading of *Bartlett* and a reasonable argument for an extension of existing law.

## V.     This case does not meet the *Vaughan* standard for either fee shifting or the imposition of sanctions.

*Vaughan* forbids the imposition of sanctions for novel claims if they are not squarely foreclosed by existing precedent and seek to extend (rather than change) existing law. *Vaughan*, 62 F.4th at 206. Neither of the *Vaughan* prerequisites for sanctions are present in this case.

Fifth Circuit cases that even mention cumulative voting are rare, and none address the claim made by Plaintiff in this case. In *Reyes v. City of Farmers Branch, Tex.*, 586 F.3d 1019 (5th Cir. 2009) the Fifth Circuit briefly considered a case appealed from this Court in which cumulative voting had been a proposed remedy, but neither the lower court nor the Fifth Circuit considered the consequences of that remedy with respect to proof of a Section 2 violation. Claims for a cumulative voting remedy played a more prominent role in *League of United Latin Am. Citizens, Council No. 4434 v. Clements*, 999 F.2d 831 (5th Cir. 1993) but only indirectly. Among many other issues in the case was the importance of the State of Texas "linkage interest" in the at-large voting system at issue. The plaintiffs claimed that the existence of a possible cumulative voting system meant the linkage interest should be given little weight. Because the plaintiffs were seeking single district voting, not cumulative voting, the Fifth Circuit found the existence of a hypothetical cumulative voting remedy irrelevant to the case before it, writing:

> Limited and cumulative voting are election mechanisms that preserve at-large elections. Thus, they are not "remedies" for the particular structural problem that the plaintiffs have chosen to attack.

999 F.2d at 876 (5th Cir. 1993). In other words, the plaintiff had to prove a violation that would be cured by the remedy they sought.

Cumulative voting was requested as a remedy in *Magnolia B. Ass'n, Inc. v. Lee*, 994 F.2d 1143 (5th Cir. 1993), but the Fifth Circuit never considered what effect that request might have on proof of a Section 2 violation because after trial the district court found that even with the *Gingles* preconditions satisfied for one of the plaintiffs' redistricting schemes, the plaintiffs failed to show a lack of opportunity under the totality of the circumstances test. *Id.* at 1148. Failure under the totality of the circumstances test left consideration of the remedy being sought unnecessary.

Finally, in *League of United Latin Am. Citizens #4552 (LULAC) v. Roscoe Indep. Sch. Dist.*, 123 F.3d 843, 847 (5th Cir. 1997) the Court affirmed a District Court judgment that upheld an at-large cumulative voting system against a demand for a change to single member districts. Because the defendants, rather than the plaintiff, wanted cumulative voting the trial court and Fifth Circuit were only required to consider liability under Section 2 in its usual context – a demand for single district voting. Plaintiff has found no case in which the Fifth Circuit or Supreme Court rejected the claim made in this case; that is, a case in which there has been a denial of equal opportunity from more than the electoral system in and of itself and cumulative voting provides a remedy for that denial. Similarly, Plaintiff has found no case in which the first *Gingles* precondition was applied to a liability finding in such a case.

## CONCLUSION

*Gingles* and its progeny were based on the general principle that:

> In order for an electoral system to dilute a minority group's voting power, there must be an alternative system that would provide greater electoral opportunity to minority voters.

*Gingles,* 478 U.S., at 88, 106 S.Ct., at 2786 (O'Connor, J., concurring in judgment). When the only "alternative system" before the Court is the creation of or a change in voting districts this principle leads to the *Gingles* preconditions. In the case before this Court, however, creation of single member districts is not the only "alternative system." The Plaintiff proposes instead the use of

cumulative voting, and the appropriate question is, therefore, whether when the totality of the circumstances show a denial of equal opportunity, cumulative voting "would provide greater electoral opportunity to minority voters." It may not guarantee electoral success, but that is not the test adopted by the Supreme Court. If cumulative voting would provide more equal electoral opportunity, then the purpose of the *Gingles* test for a Section 2 violation dilution claim has been met because there is a "an alternative system that would provide greater electoral opportunity to minority voters." *See Holder*, 512 U.S. at 887 (O'connor, J., concurring in part and concurring in the judgment).

The Plaintiff's claims in this lawsuit were not baseless; they were simply not the kinds of "vote-dilution" claims usually made under Section 2 of the Voting Rights Act. Plaintiff's arguments are not "squarely foreclosed" by existing Fifth Circuit precedents, none of which considers the claim being made by Plaintiff. Plaintiff's claims are not baseless or frivolous and there is no good cause to impose sanctions.

Signed on February 6, 2026.

Richard M. Hunt
Texas State Bar No. 10288700
rhunt@hunthuey.com
Jeanne M. Huey
Texas State Bar No. 24004636
jhuey@hunthuey.com

HUNT HUEY PLLC
3010 Mountain Ash Court
Garland, Texas 75044
Telephone: (214) 641-9182
Facsimile: (214) 279-6124

ATTORNEYS FOR PLAINTIFF AND
PLAINTIFF'S COUNSEL

## CERTIFICATE OF SERVICE

I certify that on February 6, 2026 the parties listed below were served with the foregoing instrument through the Courts ECF filing and service system.

Timothy Davis
tdavis@jw.com

Allison B. Allman
aallman@jw.com

Alexandra M. Williams
amwilliams@jw.com

Bethany Pickett Shah
bpickett@jw.com

Adam W. Aston
aaston@jw.com

Richard M. Hunt